FILED

09/28/2017

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 10, 2017

## STATE OF TENNESSEE v. DANIEL T. MAUPIN

**Appeal from the Circuit Court for Dickson County**
**No. 22CC-2014-CR-640     David D. Wolfe, Judge**

_____

### No. M2016-01483-CCA-R3-CD

_____

The Defendant, Daniel T. Maupin, was convicted by a Dickson County Circuit Court jury of criminally negligent homicide, a Class E felony, and driving under the influence ("DUI"), a Class A misdemeanor. He was sentenced to consecutive terms of two years for the criminally negligent homicide conviction and eleven months and twenty-nine days, suspended after service of six months, for the DUI. On appeal, the Defendant argues that the trial court erred: (1) by not declaring a mistrial after a prospective juror made a statement about drug impairment; (2) by not having the jurors put their questions in writing during the deliberations and not reducing supplemental jury instructions to writing; and (3) by denying judicial diversion. After review, we affirm the judgments of the trial court. However, we notice that the judgment in Count 2 and the transcript from the sentencing hearing indicate that restitution was reserved. Therefore, we remand for a restitution hearing or entry of a corrected judgment in Count 2 indicating the agreed-upon restitution.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed and Remanded

ALAN E. GLENN, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT H. MONTGOMERY, JR., JJ., joined.

William B. (Jake) Lockert, III, District Public Defender (on appeal and at trial); and Dawn Kavanagh, Assistant Public Defender (at trial), for the appellant, Daniel T. Maupin.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Counsel; W. Ray Crouch, Jr., District Attorney General; and Jack T. Arnold, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## FACTS

The Defendant was indicted for vehicular homicide by intoxication and vehicular homicide by reckless driving, and after a week-long, emotionally-charged trial, the jury convicted him of the lesser-included offenses of DUI and criminally negligent homicide.

The proof at trial showed that at 10:56 a.m. on June 12, 2014, a two-vehicle crash on Highway 46 in Dickson County caused the death of sixteen-year-old Marvin Andrew Morton. The Defendant was driving northbound in a fully-loaded tractor trailer. The victim was driving southbound in a GMC pickup truck towing a double-axle trailer with a lawnmower on it. The Defendant turned left from the center turn lane onto a road leading to a Pilot Truck Stop. The victim was unable to stop and collided with the Defendant's trailer, killing him instantly. One witness estimated that the victim's vehicle was traveling around twenty to twenty-five miles per hour at the time of impact.

The victim's trailer did not have functioning brakes and had a gross vehicle weight of almost as much as the pickup truck, such that the trailer was essentially pushing the truck down the road. Police investigators determined from a 219-foot skid mark that the victim's vehicle decreased in speed from fifty-one to thirty-two miles per hour prior to impact. From crash-reconstruction evidence and witnesses' statements, investigators concluded that the victim was travelling close to the forty-five-mile-per-hour speed limit and was 339 feet away from the Defendant's trailer when he started braking. Two witnesses, who were driving forty-five miles per hour and about five car lengths behind the victim, believed the victim was going about the same speed. Witnesses reported that the crash was "inevitable" when the tractor trailer pulled across the highway. One police officer and a lay witness at the scene thought that the Defendant exhibited signs of impairment; the other officers and emergency medical personnel only thought that the Defendant appeared to be upset or in shock.

The Defendant told investigators that he thought he had enough room to make the turn. However, when he got into the turn, he realized that the pickup truck appeared to be speeding up and was traveling faster than the speed limit. Blood test results from the Defendant showed Adderall in the therapeutic range and Oxycodone in a higher-than-therapeutic range. Experts opined that the drugs could have effects on perception, critical judgment, and reaction time. Records showed that the Defendant filled a prescription for twelve pills of Oxycodone on May 18, 2014, that should have been taken over a two-day time period, but the Defendant told an officer that he thought he had "a couple left" on the day of the accident. The Defendant did not have a recent prescription for Adderall. Federal regulations pertaining to commercial motor vehicles prohibit a driver from

reporting to duty while using a prescribed controlled substance unless a licensed medical practitioner has determined that the drug would not adversely affect the driver's ability to safely operate a motor vehicle.

Following the trial, the trial court conducted a sentencing hearing, after which it imposed a sentence of two years for the criminally negligent homicide conviction and eleven months and twenty-nine days, suspended after service of six months, for the DUI.

## ANALYSIS

The Defendant appealed, arguing that the trial court erred: (1) by not declaring a mistrial after a prospective juror made a statement about drug impairment; (2) by not having the jurors put their questions in writing during the deliberations and not reducing supplemental jury instructions to writing; and (3) by denying judicial diversion.

### I. Mistrial – Prospective Juror Comment

During voir dire, the potential jurors were informed that the proof in the case would be that the Defendant was driving while impaired by the use of drugs, and both parties questioned the potential jurors about their opinions concerning the effect of drugs on a motorist's driving. Defense counsel told the panel that the proof would show that the Defendant was taking prescription pain medication and Adderall. Thereafter, the following exchange occurred:

> [DEFENSE COUNSEL]: [A]re any of you sitting here thinking, well, look, if he had a pain medication and he had taken an Adderall the day before I'm going to find him guilty? Anybody feel that way?
>
> . . . .
>
> THE COURT: And, [Prospective Juror], did you raise your hand?
>
> PROSPECTIVE JUROR: Yes, sir. I don't think I would be swayed, but in my profession I deal with drugs that cause impairment, and I know that it does that.
>
> THE COURT: Let me stop you for a second. Without giving your opinion about whether something does or does not do anything, the question becomes . . . [i]s there anything about your professional experience as a pharmacist -- I believe you're a pharmacist; is that correct?

PROSPECTIVE JUROR:  Yes.

THE COURT:  -- that would, in your opinion, start you out one way or the other or would you listen to the facts and decide this case on that? You're competent, as the law says, to serve even with your prior experience as long as it will not affect your ability to fairly hear the evidence and follow the law.  Do you feel like you can follow the law and hear the evidence and decide the case based on that?

PROSPECTIVE JUROR:  Yes, sir.

. . . .

[DEFENSE COUNSEL]:  [Prospective Juror], without stating what your beliefs are -- which you've almost done -- but do you have strong beliefs and knowledge in regard to whether someone driving taking these medications would be impaired or not be impaired?  Do you have strong beliefs?

[PROSPECTIVE JUROR]:  Yes, I believe they would be.

THE COURT:  And, again, that's what we're trying to avoid, is -- you're not called as a witness.  You're not called as an expert.  And I'm going to instruct all of the people who are here to ensure that nothing that one of you says about this case should affect what the rest of you do.  Now, [Prospective Juror], whether you believe one way or the other it would or would not do anything is not the issue; the issue is, do you have beliefs that would affect your ability to serve?

[PROSPECTIVE JUROR]:  No.

[DEFENSE COUNSEL]:  Your Honor, he stated that he believes they would be impaired.  It's already been stated.  Shouldn't have been stated, but it has been stated.  And if he has that belief before we get to any proof in regard to impairment, I'd ask he be challenged for cause.

After a jury-out hearing, the trial court granted the Defendant's motion to excuse the juror for cause but denied the Defendant's motion for a mistrial.  The trial court stated that it would give a curative instruction "that [the jurors] are to not be influenced by any statements that any other juror makes about their personal beliefs about this case because

that's not evidence." The excused juror confirmed that there had been no discussion about his comments among the prospective jurors.

Thereafter, the prospective jurors returned to the courtroom, and the trial court gave the following instruction:

[M]y instruction to you is that when a juror is asked a question and gives their answer to that question it is their opinion; it is not evidence in this case. And you're instructed to disregard what they may say regarding any issue in this case and decide this case solely upon the evidence that's presented in this case from the witnesses and the exhibits.

And I, having sat in the back, it's probably difficult for those of you in the back to hear everything that the jurors are saying in response to questions. But I'm instructing you that any answer that a juror gives to a question is not evidence. It's not to be considered by you -- if you were selected to serve -- as anything other than someone's opinion about that. And we all have opinions about different things.

So one of the jurors that was called made some remark about his opinion about something. That's just his opinion. You're not required to accept that.

In fact, I'm telling you to disregard that opinion because it is nothing more than his stated opinion and he's not considered to be a witness in this trial or an expert in any way.

The Defendant argues that the trial court should have granted a mistrial, contending that the prospective juror/pharmacist's statement of opinion about drug impairment was "the proverbial bell that can't be unrung" and "amount[ed] to an expert giving an opinion on an ultimate jury issue that is not subject to cross examination and . . . [he] was not prepared to defend with [his] own expert."

The decision of whether or not to declare a mistrial lies within the sound discretion of the trial court. State v. Land, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000). A mistrial should be declared in a criminal case only when something has occurred that would prevent an impartial verdict, thereby resulting in a miscarriage of justice if a mistrial is not declared. See id.; State v. Jones, 15 S.W.3d 880, 893 (Tenn. Crim. App. 1999); Arnold v. State, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). "Generally a mistrial will be declared in a criminal case only when there is a 'manifest necessity' requiring such action by the trial judge." State v. Millbrooks, 819 S.W.2d 441, 443

(Tenn. Crim. App. 1991) (quoting Arnold, 563 S.W.2d at 794). A manifest necessity exists when there is "no feasible alternative to halting the proceedings." State v. Knight, 616 S.W.2d 593, 596 (Tenn. 1981). The burden to show the necessity for a mistrial falls upon the party seeking the mistrial. Land, 34 S.W.3d at 527. Absent evidence that the jury that heard the case was prejudiced or biased by statements made by a prospective juror during voir dire, such statements are not grounds for a mistrial. State v. Brown, 795 S.W.2d 689, 696 (Tenn. Crim. App. 1990).

The record shows that the prospective juror's opinion was restated upon defense counsel's own questioning and then further emphasized when counsel repeated the opinion in front of the jury pool before moving to strike the juror for cause; thus, the Defendant arguably invited the error. In addition, the trial court removed the prospective juror for cause and then instructed the remaining members of the jury pool to disregard any opinions they may have heard. We presume that jurors follow the instructions of the trial court. See State v. Young, 196 S.W.3d 85, 111 (Tenn. 2006). The record shows that jury selection continued for several more rounds before a jury was empaneled. Nothing in the record indicates that the statement made during voir dire imparted any bias or prejudice to the jurors who heard the case, and the jury's verdict of lesser-included offenses suggests otherwise. The trial court did not abuse its discretion in denying the Defendant's request for a mistrial.

## II. Jury Questions and Supplemental Instructions

The record shows that the trial court gave the jury its final instructions, and the jury retired to deliberate. At some point, the court informed the parties that the jury had requested to use a dictionary and that the court planned to inform the jury that the court could not give it outside information. Defense counsel suggested, "If it's a legal term, they can ask you." The court explained to the jury that the court could not provide outside information but that it could possibly assist if there was a question about a particular term or something in the charge. The jury then specified that it would like verification of what the word "killed" meant in the context of the vehicular homicide by intoxication charge. The court responded:

> [I]n this case, "killed" means to take the life or, you know, take action that results in the death of. There is actually, I think, a stipulation at the outset of this case that there's no question that the parties have stipulated that the accident involved resulted in the death of the victim in the case. So that legal definition is essentially taking of the life, taking action that resulted in the taking of the life. And it's been stipulated that the action in particular in this case was the cause of the death of the young man.

-6-

The jury then asked for more clarification as to the meaning of the statutory language, "That the [D]efendant killed the alleged victim by the operation of a motor vehicle." The trial court responded:

> It means that vehicular homicide requires that it be a result of an operation of a motor vehicle that a person is killed. In other words, there are different types of homicide, which are the taking of a human life, but vehicular homicide, the requirement of that is that the [D]efendant killed or caused the death of the alleged victim by operation of a motor vehicle. In other words, the [D]efendant would have to be found to be operating a motor vehicle at the time, and the operation of that motor vehicle would have to have resulted in the death of that individual.

The trial court then went further:

> [A]s I've explained to you the stipulation was that the accident itself did result in the death. There's no dispute about that. And the other elements of the crime are also -- you have to find them all in order to find any of that. Does that help clarify for you? Okay. Well, ladies and gentlemen, I think the clerk . . . is on the way to get you-all some lunch, when we stopped her about bringing you in. The reason I do this rather than come back, every question that you have like that if it is significant enough that we need it on the record in the presence of the attorneys, so that we can explain it to you. Anybody have any questions or anything that they wanted to have added to that?

The State and defense counsel affirmed that they had nothing else to add to the trial court's explanation.

The jury resumed its deliberations but later indicated that it had another question, seeking clarification about the stipulation. Defense counsel commented that the "best course of action would be have [the jury] put the question in writing, [and] us try to find in the transcript where that stipulation is." The court called the jury in to ascertain its precise question. The jury returned to the courtroom, and the following exchange took place:

> JUROR: Earlier when we asked about page 5, the first line --
>
> THE COURT: Right.

JUROR: "The defendant killed the alleged victim by the operation of a motor vehicle," is that the line we asked you about earlier?

THE COURT: It is.

JUROR: And was your answer that both parties stipulated to that language?

THE COURT: What my answer was as I recall it was that there was a stipulation by the parties that the accident involved was the cause of death of the young man. So the cause of death without dispute from the evidence and I think the parties are not in dispute that the accident in this case was the cause of death. And the definition of the law that we're dealing with about vehicular homicide whether be by intoxication or otherwise is that the defendant killed or took the life of or caused the death of, however you want to describe it, those are all synonymous, I think, the victim in the case by the operation of a motor vehicle. And it was stipulated that the cause of death of this young man was the accident in question.

If you need more of an explanation than that, if you want to know exactly what was stipulated to, then we can retrieve the audio recording of it and go from there to find out for sure the exact wording of that, if that wording makes a distinction.

JUROR: Okay. I think we're okay. On page 8, about a third of the way down the page, this is a different charge, number 1 there says that the defendant killed the alleged victim. Is that synonymous with --

THE COURT: Yes.

JUROR: They mean the same thing?

THE COURT: The use of the word "killed" is basically like when you see in television shows or something where someone, you know, murders someone intentionally. But "killing" in legal terms means that you're responsible for loss of life. That's essentially what that means.

JUROR: Okay. We've got one more I've got to find, page 9 in the last paragraph where it says "Criminal negligence means that a person acts with criminal negligence when the person ought to be aware of the substantial

and unjustifiable risk that the alleged victim will be killed." One of our jurors would like an explanation for that.

THE COURT: Well, criminal negligence means -- and that definition of the law is basically what you're talking about, it is one of the lesser included offenses that you were given -- criminal negligence means that a person who is criminally negligent, and that was defined for you that when a person is guilty of criminal negligence when that person ought to be aware of a substantial and unjustified risk that the victim would be killed based upon their actions, if that makes sense to you, that the negligence that is alleged was such that it would create a substantial and unjustifiable risk to the alleged victim or that the alleged victim would be killed as a result of this negligence.

And it goes on to define that the risk must be of a nature and degree that failing to perceive it would constitute a gross deviation from the standard of care that a[n] ordinary person as viewed from the accused person's standpoint. So it boils down to negligence that's defined for you as criminal negligence means that it's a person acting in such a way that they take a substantial and unjustifiable risk and that causes the death of an individual potentially.

JUROR: Okay.

THE COURT: Any further questions?

JUROR: No.

THE COURT: Again, definitions are couched in legal terms, which I know most of you have little experience with. What I would remind you is that the facts of the case are such as you have determined them to be and the application of the law is how you arrive at your verdict. So I'll answer[] as many questions as often as you need in order to arrive at a verdict or to help you in arriving at a verdict if you're able to do so without sacrificing your true beliefs. In any event, what we will do is send you back. Is there any matter to take up outside the presence of the jury before I send them out?

[DEFENSE COUNSEL]: No, Your Honor, there's not.

THE COURT: I believe that that's the best of my ability to answer some of these questions regarding the use of the word "killing," which means really

-9-

just the causation of death type situation. But it's unlike the intentional killing that a person might be thinking of the normal vernacular. But if that helps you in your decision, then, I think everybody is on the agreement that that adequately answers your question and you be allowed to go back and continue your deliberations, thank you.

The Defendant asserts that the trial court erred by giving instructions to the jury after the final charge without reducing the instructions to writing and by not making the jury submit its questions to the court in writing. He also claims that the trial court's supplemental instructions did not accurately reflect a stipulation that "the victim died as a result of the accident" and misstated the law of criminally negligent homicide.

"It is well-settled in Tennessee that a defendant has a right to a correct and complete charge of the law so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." State v. Farner, 66 S.W.3d 188, 204 (Tenn. 2001) (citing State v. Garrison, 40 S.W.3d 426, 432 (Tenn. 2000); State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990)). Accordingly, trial courts have the duty to give "a complete charge of the law applicable to the facts of the case." State v. Davenport, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (citing State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986)). When determining on appeal whether jury instructions are erroneous, this court should "review the charge in its entirety and read it as a whole." State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997) (citing State v. Stephenson, 878 S.W.2d 530, 555 (Tenn. 1994)). A jury instruction is "prejudicially erroneous if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." Id. (citing State v. Forbes, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995); Graham v. State, 547 S.W.2d 531 (Tenn. 1977)). Even if a trial court errs when instructing the jury, such instructional error may be harmless. State v. Williams, 977 S.W.2d 101, 104 (Tenn. 1998). An error will be considered harmless "unless, considering the whole record," it "more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b).

The Defendant asserts that the trial court erred by giving instructions to the jury after the final charge without reducing the instructions to writing and by not making the jury submit its questions to the court in writing. The record shows that the trial court complied with Tennessee Rule of Criminal Procedure 30(c) by providing the jury with a copy of its written final charge. The Defendant's contention is with the supplemental instructions given to the jury after deliberations had begun, but the supplemental instructions only clarified the written charge and therefore did not need to be in writing. See State v. John William Matkin, III, No. E2005-02946-CCA-R3-CD, 2007 WL 4117362, at *8 (Tenn. Crim. App. Nov. 19, 2007), perm. app. denied (Tenn. Apr. 7, 2008). Even if the supplemental instructions did more than merely clarify the prior

instructions, which would have required them to be in writing, such failure would only be reversible error if it more probably than not affected the judgment. State v. Gorman, 628 S.W.2d 739, 740 (Tenn. 1982). Having reviewed the entire dialogue at issue, we conclude that any failure in reducing the supplemental instructions to writing was harmless. As to the Defendant's second point of contention, he has provided no authority for his assertion that it was error for the jury questions not to be submitted in writing, nor do we see how the failure to do so affected the judgment.

The Defendant also claims that the trial court's supplemental instructions did not accurately reflect a stipulation that "the victim died as a result of the accident" and misstated the law of criminally negligent homicide.

As to the Defendant's contention regarding the stipulation, the record shows that the trial court variously phrased the stipulation to the jury as "the accident involved resulted in the death of the victim in the case"; "the accident itself did result in the death"; and "the accident involved was the cause of death of the young man." We cannot conclude that these essentially equivalent ways of phrasing that the victim died as a result of the accident were prejudicially erroneous.

With regard to the trial court's statement of the law of criminally negligent homicide, the Defendant asserts that the trial court left out the part of the definition of criminally negligent homicide that described the type of risk required. The Defendant is mistaken. As stated in the written jury charge:

> "Criminal negligence" means that a person acts with criminal negligence when the person ought to be aware of a substantial and unjustifiable risk that the alleged victim will be killed. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

In its supplemental instructions to the jury, the trial court said, in part:

> [A] person is guilty of criminal negligence when that person ought to be aware of a substantial and unjustified risk that the victim would be killed based upon their actions . . . that the negligence that is alleged was such that it would create a substantial and unjustifiable risk . . . that the alleged victim would be killed as a result of this negligence.

-11-

And it goes on to define that the risk must be of a nature and degree that failing to perceive it would constitute a gross deviation from the standard of care that a[n] ordinary person [would exercise under all the circumstances] as viewed from the accused person's standpoint.

The trial court, thus, defined criminal negligence as stated in the first sentence of the statute and the risk as stated in the second sentence of the statute. See Tenn. Code. Ann. § 39-11-106(a)(4).

The Defendant further claims that the trial court lessened the burden of proof by adding the word "potentially" when it stated in conclusion, "So it boils down to negligence that's defined for you as criminal negligence means that it's a person acting in such a way that they take a substantial and unjustifiable risk and that causes the death of an individual potentially." This argument is engaging in hairsplitting, and the trial court's statement did not change the definition in any material way because "risk" is essentially the equivalent to "potential harm." See Black's Law Dictionary (10th ed. 2014) (Risk is "the chance of injury, damage, or loss.").

### III. Judicial Diversion

The Defendant lastly argues that the trial court erred in denying judicial diversion for his criminally negligent homicide conviction.

The trial court conducted a sentencing hearing, at which a probation officer testified concerning the contents of the Defendant's presentence report. The Defendant had no prior criminal history. He attended college for two years but dropped out, even though his grades were good, because he was working full-time. Prior to college, the Defendant attended a private religious high school, from where he reported having excellent grades, participating in sports, and no disciplinary problems. On his questionnaire, the Defendant stated that he rarely drank alcohol and denied using non-prescribed or illegal drugs. However, during the Defendant's interview with the probation officer, he admitted to trying marijuana one time as a teenager. The Defendant told the probation officer that he was prescribed Oxycodone and Adderall until 2014. He said that he had a surgery for which he had taken Oxycodone. The Defendant told the probation officer that he lived with his father to help care for him and that he worked out of his home. The probation officer observed that the Defendant appeared to be genuinely upset about the incident.

The victim's mother testified at the hearing concerning the loss of the victim. Statements from several of the victim's family members and friends were read at the hearing.

Detective Josh Ethridge testified that he obtained the Defendant's prescription records based on the Defendant's statement that he had been prescribed Oxycodone following dental surgery. The records indicated that the Defendant filled a prescription for twelve pills of Oxycodone for two days' use on May 18, 2014. There were no prescriptions for a time closer to the crash. The Defendant admitted that he did not have a current prescription for Adderall. Detective Ethridge read from the Defendant's statement, at no time during which did the Defendant state that he had any responsibility for the accident.

The Defendant's father, Owen Douglas Maupin, testified about the Defendant's upbringing and family life. Mr. Maupin stated that he is disabled and that the Defendant helps take care of him. He said that the Defendant works as a sales representative and is a dedicated employee. The Defendant has a daughter whom he supports even though he is not court-ordered to do so. Mr. Maupin believed that the Defendant would follow the rules of probation. The Defendant then read a statement of allocution in which he expressed sorrow for the grief and loss experienced by the victim's family.

In determining the Defendant's sentence, the trial court first reviewed the relevant portions of the sentencing act it was considering. The court reviewed the mitigating factors and found that none applied. The court observed that the Defendant had "maintained a pretty stoic demeanor" and did not appear to have accepted responsibility for his actions or show actual remorse. In reviewing the enhancement factors, the court found that the Defendant had no hesitation about committing a crime when the risk to human life was high. Accordingly, the trial court imposed a term of two years for the criminally negligent homicide conviction and eleven months and twenty-nine days, suspended after service of six months, for the DUI, to be served consecutively.

The trial court rejected alternative sentencing in the form of judicial diversion. The court stated that granting judicial diversion would violate section 40-35-103 of the Tennessee Code, that "[c]onfinement is necessary to avoid depreciating the seriousness of the offense and to effectively provide a deterrence to others likely to commit. My opinion is that confinement is necessary in order to avoid depreciating the death of a 16 year old boy who did nothing wrong[.]"

A trial court is to consider the following when determining a defendant's sentence and the appropriate combination of sentencing alternatives:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

-13-

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Tenn. Code Ann. § 40-35-210(b).

The trial court is granted broad discretion to impose a sentence anywhere within the applicable range, regardless of the presence or absence of enhancement or mitigating factors, and "sentences should be upheld so long as the statutory purposes and principles, along with any enhancement and mitigating factors, have been properly addressed." State v. Bise, 380 S.W.3d 682, 706 (Tenn. 2012). Accordingly, we review a trial court's sentencing determinations under an abuse of discretion standard, "granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id. at 707. This standard of review also applies to "questions related to probation or any other alternative sentence," State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012), as well as to the grant or denial of judicial diversion. State v. King, 432 S.W.3d 316, 324-25 (Tenn. 2014).

Following a determination of guilt by plea or by trial, a trial court may, in its discretion, defer further proceedings and place a qualified defendant on probation without entering a judgment of guilt. Tenn. Code Ann. § 40-35-313(a)(1)(A). A qualified defendant is one who is found guilty or pleads guilty or nolo contendere to the offense for which deferral of further proceedings is sought, is not seeking deferral of further proceedings for a sexual offense, a violation of section 71-6-117 or section 71-6-119, or a Class A or Class B felony, and who has not been previously convicted of a felony or a Class A misdemeanor. Id. § 40-35-313(a)(1)(B)(i). If the defendant successfully completes the period of probation, the trial court is required to dismiss the proceedings against him, and the defendant may have the records of the proceedings expunged. Id. § 40-35-313(a)(2), (b).

-14-

The decision to grant or deny a qualified defendant judicial diversion lies within the sound discretion of the trial court. King, 432 S.W.3d at 323. In determining whether to grant diversion, the trial court must consider the following common law factors: (a) the accused's amenability to correction, (b) the circumstances of the offense, (c) the accused's criminal record, (d) the accused's social history, (e) the accused's physical and mental health, (f) the deterrence value to the accused as well as others, and (g) whether judicial diversion will serve the interests of the public as well as the accused. Id. at 326; State v. Electroplating, Inc., 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998); State v. Parker, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996). A trial court should not deny judicial diversion without explaining the factors in support of its denial and how those factors outweigh other factors in favor of diversion. King, 432 S.W.3d at 326; Electroplating, 990 S.W.2d at 229. When the trial court considers the common law factors, "specifically identifies the relevant factors, and places on the record its reasons for granting or denying judicial diversion," then this court will "apply a presumption of reasonableness and uphold the grant or denial so long as there is any substantial evidence to support the trial court's decision." King, 432 S.W.3d at 327. A trial court's failure to consider the common law factors results in a loss of the presumption of reasonableness, and this court will either conduct a de novo review or remand the case to the trial court for reconsideration. Id. at 327-28.

The Defendant asserts that the trial court failed "to place an adequate explanation on the record for the denial of judicial diversion." He claims that "[t]here was no evidence introduced that [he] wouldn't be a good candidate for Judicial Diversion." The trial court need not provide a recitation of all the applicable "factors when justifying its decision on the record in order to obtain the presumption of reasonableness," as long as "the record . . . reflect[s] that the trial court considered the Parker and Electroplating factors in rendering its decision and that it identified the specific factors applicable to the case before it." King, 432 S.W.3d at 327. The record here shows that the trial court explicitly and implicitly addressed the requisite factors in making its sentencing determination. The trial court considered the Defendant's lack of a criminal record. The presentence report and witness testimony provided information regarding the Defendant's social history and physical and mental health. The trial court addressed the Defendant's amenability to correction by finding that he had not accepted responsibility for his actions or shown actual remorse. See State v. Joseph W. Denton, No. M2009-02546-CCA-R3-CD, 2010 WL 4069264, at *5 (Tenn. Crim. App. Oct. 19, 2010), perm. app. denied (Tenn. Mar. 10, 2011) (A defendant's lack of remorse or refusal to accept responsibility for his or her actions relates to the amenability to correction and is an appropriate factor to consider in deciding whether to grant or deny judicial diversion.). The trial court placed particular importance on the circumstances of the offense and the Defendant's lack of hesitation in committing a crime when the risk to human life was high, given the Defendant's conduct in creating a high risk to others by operating a large commercial

-15-

vehicle on a busy highway with insufficient sleep and after taking a non-prescribed medication and a narcotic drug. The court also expressed the need for deterrence to others and found that confinement was necessary to avoid depreciating the seriousness of the offense.

Even if the trial court's findings were deficient in some regard and this court were to conduct a de novo review of the Defendant's sentence, upon our thorough review, we would reach the same determination that the Defendant's request for judicial diversion should be denied. The Defendant's education, work history, social history, physical and mental health, and lack of a criminal record seemingly weigh in his favor, but his amenability to correction as evidenced by his failure to see that he did anything wrong, the egregious circumstances of the offense of his driving a fully-loaded tractor trailer with very little sleep and under the influence, and the deterrence value to other similarly-situated individuals, as well as the interests of justice, substantially outweigh the factors in favor of judicial diversion.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court. However, we notice that the judgment and the transcript from the sentencing hearing indicate that restitution was reserved. Therefore, we remand for a restitution hearing or entry of a corrected judgment indicating the agreed-upon restitution.

_____
ALAN E. GLENN, JUDGE